THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BERNARD GALES, Defendant-Appellant.

First District (5th Division)   No. 1—91—1838

Opinion filed June 25, 1993.—Rehearing denied August 18, 1993.

Thomas Peters and Charles G. Murphy, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann and Fabio Valentini, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, Bernard Gales (Gales), was charged by indictment with possession with intent to deliver cocaine, armed violence and unlawful possession of a weapon by a felon. Pretrial hearings were held on various defense motions. Defendant and Reginald Gales (Reginald) were tried by a jury, and codefendant, Russell Smalley (Smalley), was simultaneously tried by the trial judge. The jury found defendant guilty of possession with intent to deliver between 100 and 400 grams of cocaine and unlawful use of a weapon. Defendant was sentenced to concurrent terms of 30 years' imprisonment for the drug conviction and five years' imprisonment for the weapon possession conviction in the Illinois Department of Corrections.

Defendant raises four issues for review: (1) whether the trial court erred in failing to sustain defendant's motion to quash the warrant or to produce the informant; (2) whether the State was improperly allowed to introduce prejudicial evidence of other crimes; (3) whether the State improperly cross-examined a defense witness; and (4) whether the trial court abused its discretion in sentencing the defendant. The State raises the issue of whether this case should be remanded to enable the trial court to impose the statutorily mandated drug-offense fine.

## THE "FRANKS" HEARING[1]

Defendant filed a motion to quash the warrant and suppress evidence. Based on affidavits attached to the motion, the trial court found that defendant had made a sufficient preliminary showing to

---

[1] "Franks" hearing is a hearing contemplated by the case of Franks v. Delaware (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, where an attack is made on the truthfulness of a search warrant.

warrant an evidentiary hearing. Over the State's objection, the trial judge granted defendant's motion for a *Franks* hearing.

At the hearing, Roxanne Boatman testified that during March 1989, she was the manager of Service Optical in Naperville. On March 18, 1989, Boatman received an employment application from, and interviewed, defendant. On Saturday March 25, 1989, defendant arrived at the store at approximately 8:30 a.m. for a training session. He left at approximately 5:30 p.m.

Michael Thornton testified that he lived at 5357 South May, a two flat, during March 1989. He leased the first-floor apartment and basement area. On March 25, 1989, the basement door was nailed shut and barricaded with two-by-fours to prevent break-ins. Inside the apartment an old stove was pushed against the basement door. Although Thornton knew defendant, they were not friends, having had a conflict about a girlfriend. To his knowledge, Gales had never been inside either Thornton's apartment or the basement. Thornton did not allow defendant to use the 5357 May apartment at any time on March 25, 1989, nor did Thornton recall seeing Gales at all that day. On the evening of March 24 he was home with his infant son. On the evening of March 25 he was also home, except for 30 minutes that he was at his mother's home. At approximately 9:30 p.m. on March 25, 1989, police officers entered 5357 South May through the basement door that Thornton testified was barricaded. On that date Thornton was arrested for a narcotics violation. When Thornton saw the basement door again on the 26th, the door was torn down.

Officer Robert Schaefer was called to testify by the defense. On March 25, 1989, Officer Schaefer, a 14-year veteran of the Chicago police department, obtained search warrants for the premises at 5350 and 5357 South May. The search warrants were executed at 9:30 that evening.

Schaefer claimed that he spoke to a confidential informant at 1 p.m. on March 25, 1989. He started work at 5:30 but he reported early that day, around 5 p.m. As soon as he got to work, he began typing out the warrant affidavit. Schaefer did not takes notes during the conversation he had with the confidential informant. Schaefer testified that the informant had his home telephone number and had contacted him at home at approximately 1 p.m. on March 25, 1989. He spoke with him for approximately 10 to 15 minutes. Ordinarily an informant would be given a beeper number, rather than a home phone number, but Schaefer testified that he did not have a beeper at that time. An objection was sustained when Schaefer was asked what time of day the informant went to 5357 South May. Included in the com-

plaint for search warrant was information that Schaefer had known the confidential informant for 18 months and the fact that the inform-ant had given Schaefer information on at least five occasions, two of which had occurred within the last six months and on each occasion contraband was recovered and arrests were made. Schaefer had thrown away all of his notes for the years preceding 1989 and could not produce the names of any other persons who were arrested as a result of this informant's work.

Schaefer testified that on March 25, 1989, the informant went to 5357 South May, where he met Bernard Gales. Gales gave the inform-ant some cannabis which the informant smoked. Gales then took the informant over to 5350 South May to the first-floor apartment where the informant purchased cannabis. The informant left Gales and went to a different location, where the informant again smoked some mari-juana, and as a result of ingesting this marijuana into his system, he enjoyed the same high he always enjoyed when smoking marijuana.

Defendant's wife, LaSauna Gales, testified that in March 1989 she lived with defendant and their daughter in the first-floor apartment at 5350 South May. On March 25, 1989, she was home when the police raided their apartment. The police searched their apartment, and she and Gales were arrested and taken to the police station. While at the station, Officer Schaefer handed her a card with his name on it. He told Mrs. Gales to beep him at the number listed on the card, and if she could provide some good information it would help her husband. Mrs. Gales produced the card Schaefer gave her. Printed on the card were his name, two police station phone numbers and a beeper num-ber.

Defendant testified that on March 24, 1989, he was home with his wife and daughter. He went to bed around 10 p.m. that evening. On March 25, 1989, he got up and left his home around 7:20 a.m. to go to a job training session at Service Optical in Naperville. Defendant ar-rived in Naperville at 8:30 a.m. and spent all day in training with Roxanne Boatman. He drove directly home after leaving Service Opti-cal. He arrived home at approximately 6:30 p.m. and watched a bas-ketball game on television. From the time he went to bed on the eve-ning of the 24th until he left his home the following morning at 7:30 a.m. no one came into his home. His home is across the street from 5357 South May and he was familiar with that building.

Upon being recalled to testify, Officer Schaefer testified that he was one of the officers who executed the search warrant at 5357 South May on March 25, 1989. Other Chicago police officers placed defendant under arrest after executing a search warrant at the first-

floor apartment at 5350 South May. When confronted with the business card with a beeper number on it, Schaefer responded that he had utilized a beeper that had that number in 1989. He did not recall if the number was his beeper number or one of his partner's beeper numbers because at that point in time he had to use other people's beeper numbers until he could obtain one for himself. Officer Schaefer continued to maintain that the informant had his home phone number; he had given him his home phone number instead of his pager number when he first met the informant, because he did not have a beeper at that time. Cannabis was recovered in the basement at 5357 South May and cocaine was recovered at 5350 South May.

The State moved for a directed finding. The defense asserted that the affidavits submitted by the defendant accounted for all of the day of March 25 up to the time the warrant was executed. Defendant renewed his request that the trial court order production of the informant before defendant rested his case on the motion to quash. Defendant also pointed out that Officer Schaefer claimed he had no notes of his alleged conversation with the informant and that Ms. Boatman, a neutral witness, accounted for all of the time between 8:30 a.m. and 5:30 p.m. on March 25, 1989. The trial court denied defendant's request for the production of the informant.

When announcing its holding, the trial court stated that defendant had to prove by a preponderance of the evidence that Officer Schaefer lied or acted with reckless indifference to the truth when he prepared the warrant affidavit. Without disclosing what questions were asked or answers given, the trial judge explained that he had met and interviewed the confidential informant alone. The informant had been presented to him by Officer Schaefer and an assistant State's Attorney. Other than a greeting, the trial judge did not speak to Officer Schaefer at that time. The trial judge went to another location to speak with the informant; the conversation took place off the record; neither the attorneys nor a court reporter was present. The trial judge indicated that suggested questions were submitted by the defense, and he asked those that he thought were appropriate. The trial court found: that the affiant (Schaefer) knew the area; that he had seen the buildings in question though he had never checked them out or been in them; and the affiant had seen and spoken with the defendant on several occasions, although he had never arrested him. The trial court further found that there was, in fact, a confidential informant in this case and that the confidential informant gave the affiant the information that appears in the search warrant. The trial court also found that the defendant by his own testimony was available at

home from midnight until 7:30 a.m. on the date in question and that neither the affidavit nor the complaint indicates the time of the purchase. In addition, the trial judge found the affiant had given his home number to the confidential informant, that on the date in question the affiant did not carry or have in his possession a beeper, and the affiant was, in fact, contacted at home by phone by the confidential informant. The trial court found that the defendant failed to prove by a preponderance of the evidence that the affiant either in reckless disregard of the truth or knowingly and intentionally made false statements in the warrant affidavit. Noting the exception of the defense, the court denied the defendant's motion to quash and granted the State's motion for a directed finding. The trial judge took no notes during his conversation with the informant and defendant's request for a summary of the trial judge's meeting with the informant was denied.

In regard to the charge of unlawful possession of a firearm by a felon, the parties stipulated prior to trial that the defendant had a prior conviction, obviating the requirement that the jurors know about the prior conviction (the only issue remaining on that charge would be whether or not defendant possessed a weapon). Defense counsel also objected to the State's proposed use of other crimes evidence. To prove intent in the present case, the State proposed to use two alleged delivery cases: one of these deliveries occurred seven months before the charged offense and the other occurred six months after the charged offense. Defense counsel requested additional discovery on the "other offenses" and objected to the use of this evidence on the grounds it was (a) too remote; (b) speculative and based on highly suggestive identification procedures; and (c) more prejudicial than probative. The trial court took defendant's objections under advisement after directing the State to provide a full disclosure of the "other crimes" evidence.

TRIAL TESTIMONY—STATE'S CASE

Officer Thomas Richardson (Richardson) testified that he was a "gang specialist" whose duties were to "monitor all gang activity inside the city." Defense counsel objected to the testimony about his duties relating to gang activities; however, the trial judge allowed the answer to stand. Richardson was assigned to execute a search warrant at 5350 South May on March 25, 1989. The entry team also consisted of Sergeant Fitzgibbons, Lieutenant King, and Officers Balice, Russell, Williams, and Jedlowski. Another unit simultaneously executed a search warrant across the street at 5357 South May.

Officer Richardson arrived at the location in a car with Officer Balice. He noticed three black men standing on the front porch. He was familiar with Bernard Gales and testified that he was one of the men standing on the front porch. Richardson yelled "Bernard, come here," at which point the three men on the porch attempted to run inside. The three men were bumping into each other, and the officers immediately gave pursuit up the stairs into the doorway area. Richardson testified that defendant was the last of the three men to get inside the apartment.

When he first saw Gales standing on the porch, as he exited his car, Officer Richardson was approximately 20 feet away, and by the time the men turned and saw the officers coming towards them, he was approximately 10 feet away. Officer Balice was right behind him followed by Sergeant Fitzgibbons and gang specialist Russell. When Richardson got to the exterior door, he noticed Gales make a left into a door that led into the first-floor apartment, while the other two men ran up a flight of stairs. Richardson followed Gales. Sergeant Fitzgibbons and Officer Balice followed him into the first-floor apartment while gang specialist Russell pursued the two subjects running up the stairs. Gales ran through the hallway towards the rear of the apartment with the police in direct pursuit. When Gales entered the kitchen area of the apartment, he dropped two clear bags of white powder to the ground. Richardson continued in pursuit of Gales, who tried to go out the back door. Gales reached for the door handle and Richardson and Balice grabbed him. After retrieving the plastic bags, later revealed to contain cocaine, Gales was advised of his rights and searched. Officer Richardson recovered a set of keys from defendant's pocket, one of which fit into the front door lock. Subsequently, Officer Russell came downstairs with Reginald and Smalley. Officer Russell was carrying three bags of cocaine.

Richardson testified Lieutenant King arrived. Lieutenant King went over to a table located in the front room. He opened up the table and discovered a brown paper bag filled with money. Two clear plastic bags containing numerous smaller clear plastic bags of white powder were also recovered from the table. After several officers searched the bedrooms, Officer Jedlowski handed Richardson a two-shot Derringer. Defendant admitted that the weapon belonged to him. When Gales was booked at the station, he provided his address as 5350 South May, first floor.

Richardson conceded in cross-examination that he did not see the bags of cocaine when he first saw defendant standing on the porch. He did not see the cocaine until defendant was in a small hallway on

his way to the kitchen. Richardson also admitted that he signed an arrest report which stated that cocaine was found in a bedroom, even though no cocaine was actually found there. He never corrected the report.

During cross-examination, Officer Richardson was asked if he contacted an assistant State's Attorney when defendant was questioned at the police station. The officer responded that he was "pretty sure" one was called since defendant was a known felon arrested for possession of a weapon. When the defendant later objected to this response, the prosecutor stated, out of the presence of the jury, that "the only type of case that need[s] approval by an assistant State's Attorney in this particular case would be unlawful use of a weapon by a felon."

Sergeant Robert Fitzgibbons (Fitzgibbons) testified that as a sergeant assigned to gang crimes south, he supervised personnel in the investigation of gang-related crimes. Defense counsel objected to the relevance of the duties of such a unit; however, the trial court allowed the answer. He was a member of the entry team at 5350 South May on March 25, 1989.

Fitzgibbons testified that when he first arrived at that location the men on the porch at 5350 South May ran into the building. Fitzgibbons followed Officers Richardson and Balice as they chased defendant through the first-floor apartment. Two other individuals ran upstairs. He testified that the officers caught defendant at the rear door, and they recovered two bags of cocaine dropped by the defendant. Fitzgibbons witnessed Richardson discover a set of keys when he conducted a pat down of the defendant, and he witnessed Lieutenant King discover a bag of money (later determined to be $37,303). Officer Russell brought downstairs the two individuals that Fitzgibbons had previously seen on the front porch and whom he had previously seen run up the stairs. Officer Russell turned over some more narcotics to Richardson. Fitzgibbons testified that Officer Jedlowski searched the middle bedroom where he discovered a Derringer pistol. He heard defendant claim ownership of the gun.

On cross-examination, Fitzgibbons testified that one of the officers had a sledgehammer with him when they approached 5350 South May in case force was necessary to gain entry; however, the sledgehammer was not used. He did not recall any damage to the front door to the building when the police arrived. Fitzgibbons testified that defendant was the first individual to go in the door. Although Fitzgibbons did not sign the police reports, he read them and authorized Officer Richardson to sign them on his behalf. He did not "catch" the portion of the report indicating a large quantity of cocaine was also

recovered from the same bedroom as the weapon. Fitzgibbons did not see Officer Russell, or any other officer, recover cocaine from the stairwell of 5350 South May.

After Fitzgibbons testified, the trial court and parties returned to the State's request to use other crimes evidence as proof of intent to deliver. In particular, the State proposed to introduce evidence of two other crimes, an August 11, 1988, incident and a September 1, 1989, incident. Over defendant's objection, the trial court ruled that the State was allowed to use one of the two incidents, not to show the propensity to commit a crime, but to show intent and knowledge, as well as common scheme.

Officer Vito Balice, one of the officers involved in the execution of the search warrant on March 25, testified for the State. He saw three black subjects standing on the landing of a porch at 5350 South May. Richardson yelled "Bernard," and the subject ran into the building. Officer Balice followed Richardson after the three men. As the subject got to the kitchen area and Officer Balice was three to four feet from him, he saw the defendant toss "two clear white objects which were clear plastic bags with like a white powder, ball type objects to the floor of the kitchen." The bags contained a "round rock-type white powder" he believed to be cocaine. Officer Balice further testified that Richardson recovered keys from the defendant's person, that Lieutenant King discovered a large bag of money and large bags of white powder in the table in the front room, and that Officer Jedlowski recovered a Derringer from a bedroom.

Officer Kevin Russell testified that in March 1989 he was a gang crimes specialist within the gang crimes section of the Chicago police department. He was involved in the execution of the search warrant on March 25, 1989, at 5350 South May. Officer Russell testified that he pursued Reginald Gales and Russell Smalley up the stairs to the second-floor apartment. Officer Russell's testimony was directed primarily at the arrest of codefendants Reginald Gales and Russell Smalley.

Prior to hearing the testimony of State Trooper Michael Cooper, the jury was informed by the trial judge that Cooper's testimony was only to be considered for the "limited purpose *** as to the intent and knowledge" of defendant.

Michael Cooper (Cooper), a narcotics enforcement agent for the Illinois State Police, testified that he was working undercover on September 1, 1989, when he met John Burnham at a McDonald's pursuant to a prearranged drug deal. Cooper was seated in the driver's seat of his undercover car, and his partner, Sergeant Davis, was

seated in the passenger seat. Their car was facing east. A blue vehicle came into the parking lot and parked one parking spot away from the police vehicle. Burnham left the police vehicle and went to the blue vehicle, knelt down beside the passenger side of that vehicle, and had a conversation with the people seated in the blue car. The blue car was located approximately 10 feet from Cooper's immediate right. Burnham came back to Cooper's vehicle and told the officers the cocaine would be there shortly. A brown car pulled in the parking lot 10 minutes later. The brown car pulled into Cooper's left and was also facing east. The view of the passenger's window of the brown vehicle was unobstructed.

John Burnham left the passenger side of Cooper's vehicle and went over to the brown vehicle's passenger window and knelt down. Cooper could see the two talking, at which time he observed the passenger of the brown vehicle hand Burnham a clear plastic bag. Cooper could see a white powdery type substance in the bag. Cooper identified defendant as the party who handed this bag to Burnham. Burnham subsequently returned to Cooper's vehicle and handed Cooper the cocaine. In return Cooper handed Burnham $900. At a later date Burnham was arrested and was charged with the delivery of this substance. Defendant was also subsequently arrested for this offense. When the defendant was arrested, he gave 5350 South May as his address.

On cross-examination, Cooper conceded that he had never seen defendant before September 1, 1989. The only physical description of the passenger in the car in his report was "male black." On cross-examination, Cooper stated the cars were faced in opposite directions (east and west), but on redirect he claimed his vehicle was facing east, the blue vehicle was facing west and the brown vehicle was facing east. Defense counsel asked whether Cooper recalled telling a defense paralegal, prior to testifying, that the cars were faced in opposite directions. Cooper could not recall making that statement.

The testimony of Sergeant William Davis (Davis) was similar to that of Cooper. He also testified that both the undercover car and the brown car faced east. Davis had an unobstructed view of the brown car. He identified defendant as the passenger of the brown car who handed the plastic bag to Burnham. Prior to September 1, 1989, Davis had never seen the defendant.

Davis testified that he was present when defense counsel interviewed Cooper. Defense counsel did not ask Davis any questions, except to ask him at the end of Cooper's interview whether his answers would be the same, to which Davis replied yes. Davis testified that he

did not recall that Cooper indicated which way the brown car was facing.

Officer Michael Jedlowski testified that he was a street officer working out of gang crimes south. On March 25, 1989, he was involved in the execution of a search warrant at 5350 South May. When he arrived at that address he saw three black males on the porch run into the house. He entered the house after Officers Richardson, Vito Balice, Bob Fitzgibbons and Kevin Russell chased the men into the house. He did not see any of the officers use any force to make entry at 5350 South May. When he entered the house he observed Officers Richardson and Balice coming from the kitchen area with the defendant and a couple of clear plastic bags of white powder, suspect cocaine. Officer Jedlowski was also present when Lieutenant King recovered approximately $37,000 from a table in the front room, and when Officer Richardson discovered two large clear bags of white powder from the same table. Officer Jedlowski searched the bedrooms of the first-floor apartment. He discovered a .38-caliber two-shot Derringer inside the bedboard of the middle bedroom.

At the close of the State's case in chief, the parties entered into several stipulations. The parties stipulated: (1) as to a proper chain of custody with respect to the white powder recovered from defendant's apartment; (2) that the white powder tested positive for cocaine with the various bags weighing 55.9 grams and 211.9 grams (a total of 267 grams); and (3) as to a proper chain of custody with respect to the cocaine delivered to Officer Cooper in the McDonald's parking lot on September 1, 1989. The parties further stipulated that if police officer Wendy Moralow were permitted to testify, she would have testified that based on her experience as an undercover narcotics officer, a user of cocaine uses between one fourth of a gram and one gram of cocaine per use, and in March of 1989 one gram of cocaine sold for approximately $100.

The State rested and all three defendants moved for directed findings. The trial court directed a finding of not guilty as to all charges against Reginald Gales and Russell Smalley. The trial court also directed a finding of not guilty as to the armed violence charge pending against defendant. The motion for directed verdict was denied as to the possession with intent to deliver charges pending against the defendant.

### THE DEFENSE CASE

David McLennachen (McLennachen), a law student who had spent seven years in an Army counter-intelligence unit and was at the time

assisting defense counsel, was called by the defendant. McLennachen testified that he was present when defense counsel interviewed Cooper. During that interview, McLennachen took notes. He heard Cooper tell defense counsel that the cars in the McDonald's parking lot were faced in opposite directions.

Felicia Williams testified that on March 25, 1989, at approximately 9:30 p.m., she was in the second-floor apartment at 5350 South May. Reginald Gales and Russell Smalley were in the apartment with her when she heard a loud banging at the downstairs front door. Subsequently, the police came upstairs and kicked in the door. Once inside the second-floor apartment, the police searched Reginald and Smalley but Ms. Williams did not see if anything was taken from them. On cross-examination Ms. Williams admitted that she knew defendant pretty well and that she was dating defendant's nephew.

Defendant's wife, LaSauna Gales, testified that she was home with defendant when the police raided their home on March 25, 1989. They were watching a basketball game on television when they heard a loud bang at the front door. Several police officers entered and they placed defendant and herself under arrest. The defendant never ran from the police. She testified that she informed the police of the gun in the bedroom. She stated that the police did not show her a search warrant until after they had taken defendant to jail. The police damaged the front door when they entered. Defendant's wife further testified that she did not know where the $37,000 came from and that the police brought the cocaine into the apartment and stated, "Look what I found."

Vernita Phillips Brown, a neighbor, testified on March 25, 1989, she "saw the streets full of squad cars." She testified that she had not seen anyone on the porch at the 5350 building before she saw the police "rush in." The door to the first-floor apartment was shut when the police tried to enter. The police used a sledgehammer to get it open.

The parties stipulated that, on the evening of March 25, 1989, Lance Wilson was arrested at 5357 South May for possession of 118 grams of cocaine and that that prosecution had since terminated and the suspect contraband destroyed. The parties also stipulated that Michael Thornton was arrested on the same date and time and charged with possession of approximately five grams of cocaine; that prosecution also terminated and the contraband was destroyed. The defense rested.

STATE'S REBUTTAL

Lieutenant Sylvester King testified that when he entered the 5350 building on March 25, 1989, he did not observe any damage to the front door. He recovered $37,000 in the front room of that building. He further testified that he did not see a police officer bring 267 grams of cocaine into that apartment.

Robert Schaefer, a 15-year veteran of the Chicago police department, identified himself as a gang crimes specialist currently assigned to gang crimes south. He testified that the narcotics recovered at the 5357 building were never brought to the 5350 building. When he entered the 5350 building, he did not notice any damage to the front door. The defendant told Officer Schaefer he owned the gun.

·After receiving instructions on the law from the judge, the jury found defendant guilty of possession with intent to deliver between 100 and 400 grams of cocaine and guilty of unlawful use of a weapon. The defendant's motion for a new trial was denied. The trial judge sentenced the defendant to concurrent terms of 30 years and five years in the Illinois Department of Corrections.

For the following reasons, we affirm the decision of the trial court.

OPINION

I

Defendant argues that his motion to produce the informant should have been sustained since defendant filed detailed affidavits contradicting the warrant affidavit and the warrant affidavit consisted of the uncorroborated statements of an untrustworthy drug addict. The defendant contends: (A) the *Franks* standard of review is different when the informant is a presumptively unreliable drug addict as opposed to a presumptively reliable citizen; (B) once defendant made a substantial preliminary showing sufficient to mandate a *Franks* evidentiary hearing, the court should have ordered the production of the informant; and (C) when an *in camera* hearing is held, the trial court must allow defense counsel to be present and an accurate record must be kept.

In *Franks*, the United States Supreme Court recognized that although an affidavit supporting a search warrant is presumed valid, a defendant has a limited right to challenge the veracity of the affidavit. The court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intention-

ally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." (*Franks v. Delaware* (1978), 438 U.S. 154, 155-56, 57 L. Ed. 2d 667, 672, 98 S. Ct. 2674, 2676.) The determination as to whether there has been a substantial showing sufficient to warrant a hearing must be made by the trial judge, and to a degree the decision on the issue will be final. (*People v. Lucente* (1987), 116 Ill. 2d 133, 152, 506 N.E.2d 1269; see also *McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056.) At the hearing, "the defendant must prove his claim of perjury by a preponderance of the evidence." (*Lucente*, 116 Ill. 2d at 151.) However, *Franks* does not require that the defendant disprove every other possibility at the preliminary stage. (*People v. Gomez* (1992), 236 Ill. App. 3d 283, 289, 603 N.E.2d 702.) "In ruling on a motion to suppress, it is the trial court's province to determine the credibility of witnesses and the weight to be given their testimony, and its findings will not be disturbed upon review [unless they are] contrary to the manifest weight of the evidence." *People v. Myers* (1978), 66 Ill. App. 3d 934, 935, 384 N.E.2d 516.

### A

Defendant argues that the *Franks* standard of review is different when the informant is a presumptively unreliable drug addict as opposed to a presumptively reliable citizen. Defendant points out, in *Franks*, the sources of the information in the warrant application were ordinary citizens who were presumptively reliable. (See *People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561.) Defendant maintains a warrant which is based on the alleged observations of a drug-addicted informant must be tested by a different standard than *Franks* established. Defendant argues when a government agent, especially one who is not presumptively reliable, is the source of the information, a different standard must apply, otherwise circumvention of the warrant requirement is easily facilitated by having one government agent (the informant) provide false, misleading or inaccurate information to the police officer affiant, who then includes the false statement in the warrant application.

We find no support for defendant's argument. It is well-settled law that a police officer's statements made in an affidavit for search warrant may be based upon hearsay, including an informant's tip. (*People v. Canet* (1991), 218 Ill. App. 3d 855, 865, 578 N.E.2d 1146, 1153.) In *Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed.

2d 527, 548, 103 S. Ct. 2317, 2332, the United States Supreme Court applied a "totality-of-the-circumstances" test to such informers in undertaking a probable cause analysis. In *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147, the Illinois Supreme Court adopted Gates' "totality-of-the-circumstances" approach. In *Tisler*, the court noted that it had regarded as believable an informant whose past tips have led to "pending arrests." (*Tisler*, 103 Ill. 2d at 249.) In the present case, details of the informant's reliability and the basis of his knowledge were included in Schaefer's affidavit.

The only evidence in the record concerning the informant's alleged "drug addiction" was the information in the warrant affidavit that he purchased cannabis from Gales, smoked it, and received the same high that he had previously experienced. We have found numerous cases where an informant made the same type of disclosure and the court applied the *Franks* standard of review. (See *People v. Velez* (1990), 204 Ill. App. 3d 318, 322, 562 N.E.2d 247; *People v. Friend* (1988), 177 Ill. App. 3d 1002, 533 N.E.2d 409; *People v. Hodges* (1987), 159 Ill. App. 3d 38, 512 N.E.2d 19.) In addition, "a statement that the confidential source previously participated in controlled buys of drugs may be sufficient to establish the veracity of the source even if the statement does not say that arrests or convictions resulted." *People v. Johnson* (1992), 237 Ill. App. 3d 860, 866, 605 N.E.2d 98.

"Defendant must prove that the affiant of the search warrant (generally a police officer), rather than the nongovernmental informant, committed the perjury." (*People v. Agyei* (1992), 232 Ill. App. 3d 546, 550, 597 N.E.2d 696, citing *Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684; *Lucente*, 116 Ill. 2d at 148.) In *Agyei*, at the hearing on the motion to quash the search warrant, the police informant denied having made the statements attributed to him in the warrant, and in addition, the evidence found in the search did not support the assertions made in the warrant. The appellate court stated that the police officer's testimony at the hearing, if believed, was sufficient to support the search warrant; the informant's testimony, if believed, was sufficient to defeat it. The appellate court noted the trial court had found the informant not credible, and the police officer's testimony not inherently incredible and found that the trial court's findings were not contrary to the manifest weight of the evidence. The appellate court held that the apparent falsity of the information received does not show that the warrant must be quashed where the warrant accurately states that the police had reason to believe the informant, because the informant had given them correct in-

formation concerning narcotics in another case. *Agyei*, 232 Ill. App. 3d at 550.

There was sufficient information in the warrant affidavit in the present case for the trial court to find probable cause under a "totality-of-the-circumstances" approach. The information contained in a warrant affidavit must contain some indication of reliability, that may be that the informant is a citizen or that the informant had given credible information in the past. The "totality-of-the-circumstances" standard of review takes into consideration many factors including the differences between a private citizen and an informant. We find no merit to the defendant's argument that we should create a new standard of review in *Franks* cases.

B

The defendant argues that once defendant made a substantial preliminary showing sufficient to mandate a *Franks* evidentiary hearing, the court should have ordered the production of the informant. Defendant claims he submitted evidence which directly contradicted the information in the affidavit for search warrant: (1) defendant's affidavit as to his whereabouts on March 25, 1989; (2) Ms. Boatman's affidavit stating defendant was in a training session with her from 8:30 a.m. until 5:30 p.m. on March 25, 1989; (3) the time sheets from Service Optical; and (4) the affidavit of Thornton which indicated that Thornton lived in the building where the alleged drug transaction occurred on March 25, 1989, that no drugs were sold, that defendant was not present there on that day, and that the doors were nailed shut at the location of the alleged drug transaction. Defendant contends that after the hearing, he had done all that he could do except call the informant as a witness. He claims to have rebutted all the information contained in the affidavit by showing: (1) his whereabouts on March 25 through three witnesses; (2) that the informant was a drug user; (3) that the police officer could not substantiate the informant's prior reliability; (4) that it was physically impossible for the events to have occurred as the informant allegedly indicated; and (5) that the affiant police officer's testimony was inconsistent.

The State maintains that since defendant's delivery to the confidential informant was not an issue at trial, the defendant's request for disclosure of the informant related only to the preliminary issue of probable cause and not the fundamental question of defendant's guilt or innocence. Accordingly, the State maintains that the trial judge's determination that disclosure of the confidential informant's identity

was not needed should not be disturbed. See *People v. Elworthy* (1991), 214 Ill. App. 3d 914, 922-23, 574 N.E.2d 727, 733-34.

The State points out that the informant's information was shown to be credible. Officer Schaefer testified that the informant told him he purchased an amount of cannabis from defendant and another person at 5357 South May. Pursuant to the search warrants, the officers discovered a large amount of cannabis at that address. Finally, as the trial court also noted, there was no information as to the hour that the informant made the purchase from the defendant; thus, the fact that defendant was not home all day does not necessarily contradict Officer Schaefer's testimony. (Officer Schaefer testified that informant told him at 1 p.m. that he had made the purchase that day.)

The State argues if the trial judge had permitted the presence of both the State and the defense counsel at the interview it would have exposed the informant's identity to them and destroyed the informant's confidentiality and, similarly, the keeping of a record of the interview would have destroyed the informant's credibility.

Supreme Court Rule 412(j)(ii) provides:

> "Disclosure of an informant's identity shall not be required where his identity is a prosecution secret and a failure to disclose will not infringe the constitutional rights of the accused. Disclosure shall not be denied hereunder of the identity of witnesses to be produced at a hearing or trial." (134 Ill. 2d R. 412(j)(ii).)

In *People v. McBee* (1992), 228 Ill. App. 3d 769, 773, 593 N.E.2d 574, the court stated:

> "It is well settled that strong public policy reasons favoring nondisclosure of an informant must be balanced against a defendant's need for disclosure in order to prepare his defense [citation], or where disclosure is essential for a fair determination of a cause. [Citation.] However, if the issue is one of probable cause, and guilt or innocence is not at stake, the nondisclosure of an informer's identity is not error. [Citation.] Whatever the circumstances, defendant must show a need for disclosure."

In determining whether a confidential informant's identity should be disclosed, a court should balance "the strong public policy reasons favoring it against a defendant's need for disclosure in order to prepare his defense." (*People v. Witherspoon* (1991), 216 Ill. App. 3d 323, 331, 576 N.E.2d 1030.) The identity of a confidential informant can be withheld if he is not a participant or a material witness to the essential elements of the offense. (*People v. Velez* (1990), 204 Ill. App. 3d 318, 326, 562 N.E.2d 247.) It is the defendant's burden to establish

that the informant can testify to facts bearing on the charged offense. (*Witherspoon*, 216 Ill. App. 3d at 331.) The State is generally not required to disclose the identity of the informant unless the failure to do so would infringe defendant's constitutional rights. (*People v. Elworthy* (1991), 214 Ill. App. 3d 914, 921, 574 N.E.2d 727, 733.) The Supreme Court in *Franks* specifically stated that the "deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." *Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684; see also *Lucente*, 116 Ill. 2d at 148, 506 N.E.2d at 1275.

The court in *People v. Velez* (1990), 204 Ill. App. 3d 318, 326, 562 N.E.2d 247, stated:

"Our supreme court, in *People v. Lewis* (1974), 57 Ill. 2d 232, 235, 311 N.E.2d 685, has adopted the *Roviaro* standard, holding that disclosure would be required when an informant acted in the dual role of informant-participant. (*Roviaro v. United States* (1957), 353 U.S. 53, 64-65, 1 L. Ed. 2d 639, 647, 77 S. Ct. 623, 630.) Where an informant's knowledge is potentially significant on the issue of the defendant's guilt or innocence, the defendant is prejudiced by the State's denial of production. [Citation.] Contrarily, where the unnamed informant was neither a participant nor material witness to the essential elements of the offense, the informant is not a crucial witness and his identity can be withheld. [Citations.] Finally, where the informant could not have testified to any fact bearing on the charged offense, but merely provided information to law enforcement officials, his disclosure is not required. [Citation.]

*** The balancing of rights test, as enunciated in *Roviaro*, calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. (*Roviaro*, 335 U.S. at 60-62, 1 L. Ed. 2d at 645-46, 77 S. Ct. at 627-29.) In Illinois the factors considered by the courts under this test are whether the request for disclosure related to the fundamental question of guilt or innocence rather than to the preliminary issue of probable cause, where the informant played an active role in the criminal occurrence, as opposed to being a mere tipster, and whether it has been shown that the informant's life or safety would likely be jeopardized by disclosure of his identity."

The informant's information in the present case was only used to support the search warrant. Defendant's delivery to the confidential informant was not an issue at trial. The informant did not par-

ticipate in the crimes defendant was charged with committing. The informant played no material role as a participant in defendant's possession of the controlled substance, nor could he have provided any testimony concerning the charged offense. He was not present when the defendant was arrested. The informant simply provided information to Officer Schaefer. The informant's testimony would have had no significant value on the issue of defendant's guilt or innocence. Thus, the burden was on the defendant to show that disclosure of the informant's identity was necessary to prepare his defense. No such showing was made. Therefore, the trial court ·properly denied the defense motion to produce the informant.

## C

The defendant argues that when an *in camera* hearing is held the trial court must allow defense counsel to be present and an accurate record must be kept. Defendant argues that once the court determines that an *in camera* hearing should be held, some provisions must be made to maintain and preserve a record of that hearing to insure the proceeding is not rendered unreviewable.

■ The State argues that the trial judge interviewed the informant in chambers and corroborated the officer's testimony. The State maintains that the trial judge properly conducted the interview outside of the presence of defendant or defense counsel, because if the trial judge had either permitted the presence of defendant or defense counsel at the interview or had the trial judge kept a record of the interview, the informant's identity would have been exposed and the informant's confidentiality destroyed. We believe the trial judge was within his discretion to maintain the confidentiality of the informant in this case. (See 134 Ill. 2d R. 412(j)(ii).) Although the trial court did not indicate what the specific questions or answers were, he did indicate the scope of his interview prior to ruling. In essence, the trial court found that the informant corroborated the information in Officer Schaefer's warrant affidavit. We believe that the trial court's comments on the record provided a summary of the *in camera* interview, while preserving the confidentiality of the informant.

Moreover, if there was any error, we find that it was harmless. The standard of review in a *Franks* case is whether the affiant police officer knowingly and intentionally, or with reckless disregard for the truth, made a false statement in a warrant affidavit. (*Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674.) We find sufficient support in the record to find that the trial court properly

denied the motion to quash without considering the information obtained in the interview with the informant.

## II

In his second assignment of error, defendant argues the evidence of "other crimes" was highly prejudicial and, since such evidence was erroneously presented to the jury, reversal was required.

## A

Defendant argues evidence of past convictions is the most damaging of other crimes evidence and, therefore, this evidence must be kept from jurors at all times. During direct examination, Officer Richardson testified that defendant, at his home, admitted to ownership of the gun discovered in his bedroom. At no time during this direct examination did the State attempt to elicit, nor did Officer Richardson attempt to testify as to, any information regarding any of defendant's past convictions or prior arrests. During cross-examination, the complained-of response was elicited:

"[Defense counsel]: When you got him down to the police station did you call in an assistant state's attorney for the purposes of talking to [defendant] to ask him questions concerning the gun, for example?

OFFICER RICHARDSON: I would have to look at my reports but I am pretty sure a state's attorney was called because [defendant] was a known felon and he had a weapon in his possession."

At the close of defense counsel's cross-examination of Officer Richardson, defense counsel requested a side bar, where the following colloquy took place:

"MR. MURPHY [Defense counsel]: *** The question to [Officer Richardson] was did you contact a State's Attorney to come over and talk to my client, that's what the question was.

His response was he did, now you have the jurors know my client has a prior felony conviction and worse they might suspect it's multiple. I am asking for a mistrial.

MR. PETRAKIS [Prosecutor]: Judge this comment was invited by Defense Counsel's cross-examination.

Judge the way our office works, narcotics cases, armed violence cases, do not need approval by a State's Attorney.

The only type of case that needs approval by a State's Attorney in this particular case would be unlawful use of weapons by a felony [sic].

Only when Mr. Murphy harped on the issue of a State's Attorney, did you bring in a State's Attorney, yeah we had to bring in a State's Attorney to get approval by the UUW by felon, it was advised by counsel's cross-examination.

Nowhere in our direct examination did we even come close to this issue. Only when Mr. Murphy harped on this issue did it come out.

THE COURT: Any response.

MR. MURPHY: My question was, did you contact a State's Attorney to come in and talk to my client, I didn't ask him, did you contact a State's Attorney to approve charges.

Did you contact a State's Attorney to talk to my client, because the issue was this supposed confession my client had given to officer Schaefer in this witness' presence, that's what this was about not the approval of charges.

THE COURT: I'd respectfully deny the motion for a mistrial. If you wish me to say anything to the jury I will be glad to, it's my opinion only highlight [*sic*] it, I leave it up to you.

MR. MURPHY: I agree with you.

THE COURT: Respectfully deny your request.

MR. EZELL [Prosecutor]: Like to make the record here, we had indicated to the officer, we are very much aware that the UUW felon charge as we articulated from the beginning could cause all kind of problems, and we have deliberately stayed away from it.

And as an Officer of the court I can indicate to you both my partner and I had indicated to the officers no mention of his background or anything like that.

I do believe that this was a spontaneous response by Officer Richardson, it was certainly not calculated by the State, when I say State, my partner and I to in any way prejudice Bernard Gales['] case."

Defendant argues that there was no nexus between Richardson's answer, the defendant was a known felon, and the question he was asked and that this strongly suggests Richardson knew he was volunteering inadmissible information. The State, however, maintains that Officer Richardson's testimony was directly responsive to defense counsel's question. See *People v. Doll* (1984), 126 Ill. App. 3d 495, 505, 467 N.E.2d 335, 342.

■ Defense counsel asked whether Richardson called in an assistant State's Attorney for the purpose of talking to defendant to ask him about the gun. Richardson replied that he did call an assistant

State's Attorney because of the gun, due to the fact that defendant was a known felon. We believe that defense counsel invited the response given by Officer Richardson. A defendant cannot complain of a response that is invited or provoked by defense counsel on cross-examination. (*People v. Peter* (1973), 55 Ill. 2d 443, 460, 303 N.E.2d 398.) Officer Richardson's answer was an isolated reference to defendant as a felon. The State never attempted to capitalize on the answer and made no references to the fact that defendant had any kind of criminal record. Defense counsel did not object to the response at the time it was given, but rather, he waited to object until he finished his cross-examination of Richardson. Even if it could be held that the defense did not invite the remark, we find that due to the overwhelming evidence of guilt in this case any error was harmless.

B

Defendant argues indirect references which suggest other criminal misconduct are impermissible and require reversal of defendant's conviction. Several police officers introduced themselves as a "gang specialist" assigned to "gang crimes south" with their assignment being "gang suppression." Defendant maintains that when these officers began their testimony defense counsel objected to their reference to "gang specialists" and "gang suppression." Those objections were overruled. Defendant points out that the word "gangs" was used more than 96 times (Officer Richardson, 20 references; Officer Schaefer, 21 references; Officer Russell, 4 references; Officer Balice, 12 references; Sergeant Fitzgibbons, 24 references; Officer Jedlowski, 8 references; and the prosecutors, 8 references) and argues these references to gang activity were totally unwarranted and highly prejudicial to defendant.

Prior to trial, the State indicated that it did not intend to offer any gang affiliations in its case in chief. However, the State requested that if it possessed information regarding the gang affiliation of any defense witness, it be allowed to use that information to show bias. The trial court stated that before the State would be allowed to go into the gang affiliation of any defense witnesses, the State was to apprise the trial judge, and the trial judge would conduct a sidebar to determine whether the information was relevant. The defense made no mention of precluding the officers from testifying as to their assignments.

The two objections to which the defendant refers occurred during the testimony of Officer Richardson and Sergeant Fitzgibbons. The objection during Officer Richardson's testimony was as follows:

"Q. [Prosecutor:] Now, is part of your duties as a Gang Specialist involved in investigating these gangs activities and the investigation and execution of search warrants relative to narcotics investigation?

A. [RICHARDSON:] That's correct.

[Defense counsel:] Objection.

THE COURT: I will let the answer stand."

The relevant portion of Sergeant Fitzgibbon's testimony provides:

"Q. [Prosecutor:] And what were your duties with the Gang Crimes South Unit?

A. [FITZGIBBONS:] Supervision of personnel there.

Q. And what were the duties of the Gang Crimes South unit in so far as their responsibilities?

[Defense counsel:] Objection, relevance.

THE COURT: I will let the witness answer."

■ Officer Richardson testified that part of his duties as a gang specialist was the investigation of gang activities and the execution of search warrants relative to narcotics investigations. Sergeant Fitzgibbons testified that his duties included the supervision of personnel in the investigation of gang-related crimes. Sergeant Fitzgibbons also had occasion to execute search warrants relative to the recovery of controlled substances. Officer Balice testified that as a gang crimes specialist he would do continuous follow-ups on gang-related crimes as well as handle investigations on all the major gangs in his area. When asked what he was doing at 5350 South May on March 25, 1989, Officer Balice responded, "I was assisting another officer in executing a narcotic's search warrant." Officer Jedlowski testified that, while he worked out of gang crimes south, he was not a gang specialist; rather, he worked "tactical" as a street officer. There was no testimony that any of the defendants were members of any gangs; in fact, there was no testimony as to any gangs or gang activity in the area of 5300 South May. In addition to gang suppression, the various officers' testimony indicated that their duties included executing search warrants for controlled substances, while Officer Jedlowski's testimony indicated that all of the officers assigned to "gang crimes south" were not "gang specialists." No evidence was presented that the investigation was gang related.

The majority of the cited uses of the word "gangs" was in introducing the police officers as "gang crimes specialists." The trial court's pretrial ruling clearly involved the alleged gang affiliation of any witness, whether the witness be a State's witness or a defense witness. The trial court did not render any ruling precluding the po-

lice officers from testifying as to their assignments. Moreover, we find the defense counsel's objections were vague at best. An objection based upon a specified ground waives all grounds not specified, and a ground of objection not presented at trial will not be considered on review. (*People v. Enis* (1990), 139 Ill. 2d 264, 294, 564 N.E.2d 1155.) Even with the value of hindsight, this court could not discern that the aforementioned objections were intended to prohibit the officers from utilizing the word "gang" in the descriptions of their titles or duties. Although we question whether it was necessary to constantly use the title "gang crimes specialist" rather than "officer," we find that the State did not violate any pretrial ruling by the trial court and that the State did not attempt in any manner to imply either that the defendant was a member of a gang or that the investigation was gang related.

C

Defendant argues the trial court erred in admitting evidence of another uncharged crime which occurred five months after the charged offense (the September 1, 1989, incident). The State had proposed to introduce evidence of two other crimes, an August 11, 1988, incident and the September 1, 1989, incident. Over defendant's objection, the trial court ruled that the State was allowed to use one of the two incidents, not to show the propensity to commit a crime, but to show intent and knowledge, as well as common scheme. Prior to hearing the testimony of State Trooper Cooper regarding the alleged other crime, the jury was informed by the trial judge that Cooper's testimony was only to be considered for the "limited purpose *** as to the intent and knowledge" of defendant.

Defendant maintains: (1) the defense never challenged the State's intent to deliver theory; (2) defendant stipulated that the amount the police allegedly found in defendant's apartment was far in excess of the amount a user would possess; and (3) the defense did not challenge Officer Schaefer's testimony that the quantity involved would only be possessed by someone who was dealing drugs. Defendant further argues that defense counsel never argued to the jury that defendant was only guilty of possession and that in this case the other crimes evidence was directed at the only issue which was not contested. The defendant contends that since defendant never contested the intent issue and formally stipulated that the amount found far exceeded a user's amount, the State did not need to prove intent to deliver, *i.e.*, if defendant possessed the drugs, he intended to deliver them, the defense being lack of possession, rather than lack of intent.

■ First, whether or not the defendant contests a State's theory of a case does not relieve the State of its obligation to prove each element of its case. This "other crimes" evidence was presented during the State's case in chief, prior to the defendant's case in chief. There was no way for the State to know what defense, if any, would be interposed. The State cannot be required to confine its evidence to rebuttal since there may be no rebuttal if defendant offers no evidence. See *People v. Cole* (1963), 29 Ill. 2d 501, 504, 194 N.E.2d 269.

Although evidence of other crimes is not admissible to show a propensity to commit crimes (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489), it is admissible to prove *modus operandi*, intent, identity, or motive. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) In *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59, the Illinois Supreme Court held that the evidence of a subsequent crime was admissible to establish intent. However, the evidence of another crime may be used only when the other crime has some threshold similarity to the crime charged. It must also be shown that the defendant actually committed the other crime or participated in its commission. *People v. Rogers* (1989), 178 Ill. App. 3d 650, 656, 533 N.E.2d 987.

The State maintains the evidence of defendant's subsequent delivery of cocaine was highly probative of defendant's intent to deliver the large amount of cocaine he possessed on March 25, 1989. In order to support a conviction for possession of a controlled substance with intent to deliver, the State must establish that the defendant had knowledge of the presence of narcotics, that the narcotics were in the immediate control or possession of the defendant, and that the amount of narcotics was in excess of any amount which might be viewed as merely possessed for personal use. (*People v. Witherspoon* (1991), 216 Ill. App. 3d 323, 333, 576 N.E.2d 1030.) One of the instructions tendered to the jury in this case provided:

"To sustain the charge of possession with the intent to deliver a controlled substance when the substance containing the controlled substance weighed more than 100 grams but less than 400 grams, *the State must prove* the following propositions:

First, that the *defendant* knowingly possessed *with the intent to deliver* a substance containing cocaine, a controlled substance ***.

If you find from your consideration of all of the evidence that *any one of these propositions has not been proved beyond a*

*reasonable doubt, you should find the defendant not guilty."*
(Emphasis added.)

Thus, it is clear the State was required to prove that defendant "intended to deliver" the cocaine, regardless of whether or not the defendant chose to contest this point.

The testimony regarding the September 1, 1989, incident, taken with other evidence in this case, could provide the basis for an inference that the defendant had the intent to deliver the cocaine found in his apartment on March 25, 1989. Since the evidence was relevant for a purpose other than to show the defendant's propensity to commit crime, it was therefore admissable. "The admissibility of evidence of other offenses rests within the sound discretion of the trial court, and its decision will not be overturned unless a clear abuse of discretion is shown." (*People v. Brown* (1990), 199 Ill. App. 3d 860, 874-75, 557 N.E.2d 611, citing *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292.) The trial judge did not abuse his discretion in admitting this testimony.

### III

In his third assignment of error, the defendant argues that the State used improper impeachment and argument in its cross-examination of defense witness David McLennachen.

At the conclusion of the direct examination of Officer Cooper, defense counsel notified the court that McLennachen would be testifying to an alleged prior inconsistent statement made by Cooper. In order that no greater weight be given McLennachen's testimony due to his association with counsel, the trial court ruled that McLennachen, who had been seated at counsel table up to that point, could no longer be seated at counsel table. He was free to remain in the courtroom after completing his testimony.

At the onset of direct examination, David McLennachen, defense counsel's law clerk, testified as to statements made by Officer Cooper to defense counsel concerning Cooper's observations of the September 1, 1989, incident. McLennachen noted Assistant State's Attorney Ezell, Sergeant Davis, Trooper Cooper, Mr. Franks, Chuck Ingles, and defense counsel were also present in the room at that time.

The State's cross-examination was conducted by David Ezell (Ezell), one of the two prosecutors on the case. First, Ezell asked McLennachen if he was present at 55th and Halsted on September 1, 1989. McLennachen replied no. Ezell then asked if McLennachen took some notes relative to the conversation that occurred in the anteroom of the courtroom the preceding day between the attorneys and the

two State troopers. McLennachen replied that he did and that a copy of the notes was present in the courtroom. Ezell asked to see the notes. McLennachen testified that he made notes about a conversation concerning a blue car and a brown car. Ezell asked McLennachen where specifically in his notes did it say that the brown car was facing in an opposite direction. McLennachen replied that those exact words were not in his notes. Ezell asked McLennachen to indicate what his notes specifically said as they related to the blue car and the brown car. McLennachen proceeded to explain the relevant portion of his notes. Ezell also questioned McLennachen about a person (Officer Balice) McLennachen claimed to have seen at the door to the courtroom during Officer Richardson's testimony. Ezell asked McLennachen what was the first thing Cooper said in relation to defense counsel's inquiry regarding the September 1, 1989, incident. McLennachen responded that he could not say for certain what the first thing said was, but that in general the whole conversation was in regard to the alleged transaction that took place at 55th and Halsted. McLennachen also testified he was only present for the direct examination of Cooper. The discrepancies he noticed between the conference with defense counsel and Cooper's direct testimony were: (1) the difference in direction that the two vehicles pointed; (2) that Cooper stated the blue car was 20 feet away when he was testifying and during the conference he said 10 feet away; and (3) during the conference Cooper said the brown car was 20 feet away.

During cross-examination, Ezell did not mention that he had been present in the anteroom for this conversation, nor did he insinuate that any of McLennachen's answers were incorrect. On redirect, defense counsel asked McLennachen if Ezell had been present in the anteroom when defense counsel spoke to Cooper.

After McLennachen's testimony, both Felicia Williams and La-Sauna Gales testified. At the conclusion of LaSauna Gales' testimony, defendant objected to the fact that Ezell had conducted the cross-examination of McLennachen since Ezell had also been a witness to the conversation in question. Defense counsel argued that if the case continued with Ezell as the prosecutor, undoubtedly he would stand up during closing arguments and continue in essence to be a witness and that the strong suggestion to the jurors would be that the prosecutor knew that McLennachen was either mistaken or lying because the prosecutor had been present. The trial court stated that such an argument would not be permitted. However, defense counsel requested that Ezell no longer be permitted to continue as prosecutor in the case. The trial court pointed out that there was also a problem in that

defense counsel was a witness to the entire conversation as well as possibly Mr. Petrakis. Ezell maintained that the tenor of the cross was based solely on the notes that the alleged witness had made and that no questions were framed in such a manner that they came from personal observation. In addition, Ezell stated, "I frankly, as an officer of the court, will make this admission. I don't recall what Mike Cooper said regarding the directions of those vehicles." Defendant then requested that the trial court permit him to call the prosecutor as a witness. The trial court denied both defendant's request to call the prosecutor as a witness and his request that the prosecutor withdraw from the case. Defendant asserts that during the prosecutor's cross-examination of McLennachen he insinuated, through his questions, that McLennachen gave untruthful testimony concerning the officer's statements and that the State did not prove up this impeachment through evidence or testimony in rebuttal. In addition, defendant asserts, that to compound the problem the prosecutor implied, in closing argument, that McLennachen had been untruthful in his testimony.

Defendant maintains that the prosecutor's conduct in acting as both an advocate and a witness in the proceeding severely prejudiced the defendant. Defendant asserts that the prosecutor was the only State witness who could prove up the insinuations raised through his own questions and the prosecutor, knowing this fact, combined with the trial court's ruling that defendant could not call the prosecutor as a witness, persisted in asking improper impeachment questions which he knew he could not substantiate with admissible evidence.

Cross-examination is ordinarily limited to matters brought out on direct examination. (*People v. Kirkwood* (1959), 17 Ill. 2d 23, 30, 160 N.E.2d 766.) It is improper for the State to ask a defense witness questions presuming facts not in evidence unless the State has admissible evidence to substantiate the inquiry. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) The danger inherent in such questioning is that the jury will ignore the witness' denial and presume the accuracy of the impeaching insinuation contained in the question. (*Enis*, 139 Ill. 2d at 297.) The State maintains that the prosecutor's cross-examination of McLennachen and all arguments that McLennachen's testimony was not credible were entirely proper. The State maintains that defendant's argument that the prosecutor acted as both witness and advocate in the proceeding has absolutely no basis in the record. A review of the record discloses that the prosecution's cross-examination of McLennachen was primarily based on what was or was not included in McLennachen's written notes of defense coun-

sel's interview with Cooper. At a sidebar, the prosecutor, as an officer of the court, admitted that he did not even recall what the officer's statement was with respect to the direction of the brown car. We agree with the State's argument on this issue. The defendant does not direct this court to, and this court was unable to find, any specific questions that were not based on the evidence in this case or any questions insinuating that McLennachen's testimony was untruthful.

In addition, defendant points out the jury was aware that the prosecutor was present at the officer's statements and contends that, since the cross-examination was conducted by the same person who witnessed the incident, the prosecutor's questions were unduly bolstered in that it was as if he were testifying on behalf of the State. Defendant argues "[t]he comments were 'highly prejudicial because they place the integrity of the office of the State's Attorney behind the credibility of the witnesses'" (quoting *People v. Valdery* (1978), 65 Ill. App. 3d 375, 378, 381 N.E.2d 1217). We find *Valdery* distinguishable to the present case. In *Valdery,* the prosecutor remarked that "I have never had contact with people who *** have had the level of integrity and character of those people" and that "I hope that you're as impressed with them as I have been." (*Valdery,* 65 Ill. App. 3d at 378.) In addition, the prosecutor made other remarks regarding the witnesses' integrity and his belief in their testimony, as well as calling defense witnesses liars. We find no such remarks by either of the prosecutors in the present case.

If anyone highlighted the fact that Ezell was present for the conversation in question it was defense counsel. The second question defense counsel asked McLennachen on redirect was whether Ezell was present when defense counsel had spoken with Cooper. In addition, had defense counsel objected prior to Ezell's cross-examination of McLennachen, the trial judge would have had the opportunity to order Mr. Petrakis to conduct the cross-examination. However, defense counsel did not make any objection until after two additional witnesses testified, far too late for the trial court to order such a remedy. Regardless of this fact, we find that Ezell's cross-examination of the witness was based on the evidence. We find no support for the contention that the mere fact that Ezell conducted the cross-examination unduly bolstered the State's argument or insinuated that the witness was untruthful.

In addition, we note, that if any error occurred, it was harmless. The testimony in question was testimony on a relatively minor matter. McLennachen's testimony was offered to impeach Cooper's testimony that two cars were facing the same way. If the cars were not facing

the same way, Officer Cooper and Davis presumably would not have had an unobstructed view of the defendant on September 1, 1989. Throughout his testimony McLennachen never wavered in his belief that Officer Cooper had stated in conference that the cars were facing in opposite directions. In addition, Cooper contradicted himself from direct, to cross-examination, to redirect. Moreover, it is questionable that the jurors even realized anything about the prosecutor having been present for the conversation and subsequently conducting cross-examination, as it was clear defense counsel had also been present for the conversation and subsequently conducted the direct examination.

Finally, defendant argues the State compounded the problem by making reference to the testimony in closing argument. Defendant asserts that the prosecutor improperly expressed an opinion on the credibility of the witness. Conversely, the State points out that the State's closing argument was handled by a prosecutor that was not present during Cooper's interview and was confined to arguments concerning the evidence presented to the jury.

Mr. Petrakis gave the State's closing arguments and Mr. Ezell gave the State's rebuttal closing. Mr. Petrakis pointed out that McLennachen worked for defense counsel and asked the jury to review his testimony very carefully. He further stated:

"Now he [McLennachen] testified that the day before he sat in an interview with Illinois State Trooper Cooper and at that point during the interview Illinois State Trooper Cooper said that his car was facing one direction and the brown car—***.

Well, I just want to say one thing about that testimony ladies and gentlemen. And that is when Dave Ezell asked Mr. McLennachen again what is the first thing that Illinois State Trooper Cooper testified to that happened on September 1st, 1989, and he said he doesn't remember the first thing that Illinois State Trooper Cooper testified to.

Ladies and gentlemen, I submit to you in essence he doesn't really remember the story in this particular case."

This was the only reference to McLennachen in the State's closing. In response, defense counsel argued that his clerk did not deceive the jury, but rather in essence his clerk corroborated the fact that Cooper could not keep his story straight. Ezell did not mention McLennachen in his rebuttal.

A prosecutor is allowed to make comments on the credibility of the witnesses, if the comments are based on facts in the record or inferences fairly drawn from those facts. *(People v. Shum* (1987), 117 Ill. 2d 317, 347, 512 N.E.2d 1183.) A review of the relevant trial testi-

mony indicates that the prosecution's remarks in closing argument regarding McLennachen were based on facts in the record. McLennachen was, in fact, employed by defense counsel and McLennachen testified that he did not exactly recall the first thing that Cooper spoke about in his conference with defense counsel.

■ Under the facts of this case, we find that the trial court did not err in denying both defendant's request to have the prosecutor withdraw or defendant's request to cross-examine Ezell. Further, we find no prejudice to the defendant as a result of these rulings.

## IV

In his fourth assignment of error, defendant maintains his 30-year sentence for a crime which did not involve violence is excessive and disproportionate to other sentences involving more serious crimes.

Although the State maintains that defendant has waived this argument by not objecting to it at the sentencing hearing and by not raising it in his motion for a new trial, such argument is unwarranted. Defendant could not have raised a sentencing issue in his motion for a new trial, since such a motion is properly argued prior to sentencing; moreover, there is no requirement that he file a separate motion for a new sentencing hearing in order to preserve possible sentencing errors for review. (*People v. Davilla* (1992), 236 Ill. App. 3d 367, 603 N.E.2d 666, citing *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1083, 456 N.E.2d 250.) Although defendant has properly preserved this issue for appeal, we find his argument to be without foundation.

It is within the discretion of the trial court to sentence a defendant, and absent an abuse of discretion, that sentence will not be altered by a reviewing court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) This is so because the trial judge is able to make a reasoned judgment based upon firsthand consideration of such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age, a position far superior to that of this court reviewing a cold record. *Perruquet*, 68 Ill. 2d at 154.

■ The sentence here is clearly within the statutory guidelines. Section 401(a)(2)(B) of the Controlled Substances Act (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(a)(2)(B)) provides that a defendant convicted of possession with intent to deliver between 100 and 400 grams of cocaine may be sentenced to a prison term of anywhere between nine and 40 years. Defendant was convicted of possession with intent to deliver between 100 and 400 grams of cocaine. It was therefore within the trial judge's discretion to sentence defendant to a term of

40 years; accordingly, the imposition of a term of 30 years was within his discretion.

The record indicates that the defendant possessed with intent to deliver 267 grams of cocaine. The trial court also considered the defendant's prior criminal record. At sentencing it was shown that defendant had four prior robbery convictions, as well as four other prior narcotics related arrests. The State also presented evidence that the defendant is a member of the Black Peace Stone Gang. Prior to imposing sentence, the trial judge pointed out that defendant was convicted for possessing a large amount of cocaine in a home where his two children lived.

We find that the trial court did not abuse its discretion in sentencing defendant to a term of 30 years.

V

■■■ The State argues that the case should be remanded to the trial court so that the fine mandated by section 5—9—1.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—9—1.1) can be imposed upon defendant. Section 5—9—1.1 (Ill. Rev. Stat. 1991, ch. 38, par. 1005—9—1.1) provides:

"When a person has been adjudged guilty of a drug-related offense involving possession or delivery of cannabis or possession or delivery of a controlled substance as defined in the Cannabis Control Act, as amended, or the Illinois Controlled Substances Act, as amended, in addition to any other penalty imposed, a fine shall be levied by the court at not less than the full street value of the *** controlled substances seized."

Although the State did not request the imposition of the fine at trial, the State maintains that this matter cannot be waived due to the mandatory nature of the fine. We disagree.

Recently, the State raised the same issue in *People v. Davilla* (1992), 236 Ill. App. 3d 367, 389, 603 N.E.2d 666,[2] and the court held:

"Supreme Court Rule 604(a)(1) (134 Ill. 2d R. 604(a)(1)) severely limits the State's right to appeal; nowhere, however, does the rule provide for an appeal 'to contest the propriety of the sentence imposed on a criminal defendant.' [Citations.] As noted in *Kent* [*People v. Kent* (1976), 40 Ill. App. 3d 256, 266,

---

[2]At the sentencing hearing in *Davilla*, the prosecutor specifically stated that he would be asking for a fine commensurate with the street value of the drugs; however, the trial judge mentioned nothing about a fine, and the prosecutor did not raise an objection or ask for clarification.

350 N.E.2d 890], '[i]n urging [this contention,] the State is here in the posture of an appellant,' but the rule 'strictly limits the State's right to appeal. *** Had defendant not brought this appeal, the State thus could not even have suggested the issue it seeks to present.' "

We note in the present case the prosecutor did not ask for a fine to be imposed at the sentencing hearing, he did not object when the trial court failed to impose a fine, nor did the State file a notice of appeal in this case. We reject the State's request for a remand for additional sentencing.

Accordingly, for all the reasons set forth above, we affirm the decision of the trial court with respect to both defendant's conviction and his sentence, and reject the State's request for a remand for additional sentencing.

Affirmed.

GORDON, P.J., and COUSINS, J., concur.